**This document has been electronically entered in the records of the United States Bankruptcy Court for the Southern District of Ohio.**

**IT IS SO ORDERED.**

C. Kathryn Preston
United States Bankruptcy Judge

**Dated: September 30, 2010**

_____

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE:                                          :

    LINDA SEIDEL                          :          Case No.  09-58731

                                       :          Chapter 13
        Debtor.

                                         :          Judge Preston

<u>MEMORANDUM OPINION AND ORDER</u>
<u>RESOLVING ORDER REQUIRING MICHAEL W. WARREN TO SHOW CAUSE</u>
<u>AND DIRECTING UNITED STATES TRUSTEE TO CONDUCT INVESTIGATION</u>

       This matter came on for evidentiary hearing before the Court on February 2, 2010, upon

the Court's Order Requiring Michael W. Warren to Appear and Show Cause Why He Should

Not Be Held in Contempt for Willful Violation of the Bankruptcy Code and Rules ("Show Cause

Order") entered by the Court sua sponte (Doc #30).  Present at the hearing were the Debtor

Linda I. Seidel, pro se, Michael W. Warren, and attorneys Rick L. Brunner, Esq., Kenneth R. Donchatz, Esq. and Charles J. Kettlewell, Esq. representing Michael W. Warren.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §1334 and the General Order of Reference entered in this District. This is a core proceeding pursuant to 28 U.S.C. §157(b).

## I. FINDINGS OF FACT

Based upon testimony presented and evidence adduced at the evidentiary hearing, the Court finds and concludes as follows:

On July 3, 2009, Ms. Seidel met with Mr. Warren for a consultation regarding the bankruptcy process. Ms. Seidel sought relief from her mounting credit card debt as well as a home equity loan encumbering her residence. During this consultation, Mr. Warren advised Ms. Seidel of the general bankruptcy process while Ms. Seidel divulged the specific facts of her current financial circumstances. Amid this exchange, Ms. Seidel explained to Mr. Warren, inter alia, that her house was an important asset and she would prefer to continue residing in it. Mr. Warren requested a fee of $3,000 for chapter 13 bankruptcy services. He then asked if she had available credit on any of her credit cards and told her he would charge his fee to her credit card. Although Ms. Seidel expressed concern about this, Mr. Warren assuaged her fears, suggesting that this is common practice. After completing the process to charge her Discover credit card for his legal fee of $3000 plus the court filing fee of $274, Mr. Warren presented and Ms. Seidel signed at least two documents: the first document was titled "Basic Bankruptcy Flat Fee Agreement", which described the services Mr. Warren would provide Ms. Seidel throughout the bankruptcy process in return for the $3,000 fee. The second document was titled "Be Careful How You Use Credit Cards," which warned Ms. Seidel of the consequences of credit card use

immediately prior to filing a bankruptcy case. After the consultation, Ms. Seidel left Mr. Warren's office under the impression that the bankruptcy process would take three to four months and she would need only make a one time payment to creditors in an approximate amount of $900.

Shortly after the July 3rd consultation, Mr. Warren's office contacted Ms. Seidel and requested she obtain an appraisal of her residence and recommended Susan Carson to provide the service. In response to this entreatment, Ms. Seidel obtained the services of Susan Carson[1] who appraised Ms. Seidel's residence on or around July 13, 2009. Ms. Carson's expert appraisal concluded that Ms. Seidel's residence had a value of $56,500. Ms. Seidel then tendered Ms. Carson's appraisal to Mr. Warren's office per its request.

Ms. Seidel was then instructed by Mr. Warren's paralegal, Melinda Potts, to contact the entity holding the first mortgage on her residence, National City Bank ("National City"), and obtain a "payoff"[2] amount. As instructed, Ms. Seidel called National City's "payoff department" and inquired as to the total outstanding balance on her first mortgage. The National City representative informed Ms. Seidel that such balance was approximately $56,900 and agreed to send her documentation confirming the outstanding balance. After the phone call, Ms. Seidel relayed the information to Melinda Potts. The documentation requested by Ms. Seidel was later

---

[1]Ms. Seidel was under the impression that Ms. Carson was an employee of Mr. Warren. However, it is clear that she was not.

[2]During her testimony, Ms. Seidel used the term "payoff" when referring to the total amount due on her mortgage as opposed to the principal balance, which obviously did not include interest or fees.

received by her in letter form, at which time she forwarded it to Mr. Warren's office. The letter indicated a total debt amount of $56,680.19.[3]

On July 29, 2009, Ms. Seidel went to Mr. Warren's law office to finalize her bankruptcy petition and related documents in order to file her bankruptcy case. Upon arriving at Mr. Warren's office, Ms. Seidel met with Ms. Potts who informed Ms. Seidel that she would be filing for chapter 13 bankruptcy relief and that Ms. Seidel would pay her creditors $6,000 over a five year period. Ms. Seidel was confounded by this information, believing it inconsistent with her prior understanding that her bankruptcy case would last approximately four months and require her to pay creditors a mere $900. Despite this surprise, Ms. Seidel continued to finalize her bankruptcy documents with Ms. Potts, reviewing and signing as required. After this meeting, Ms. Seidel's bankruptcy petition was filed on July 31, 2009 by Mr. Warren. Schedule D-Creditors Holding Secured Claims listed National City and its mortgage, reflecting an outstanding balance of $56,900.

On August 10, 2009, National City filed a Proof of Claim, which, on its face, indicated an outstanding mortgage balance of $56,425.12, materially less than the $56,900 reflected on Ms. Seidel's Schedule D, and less than that given to Ms. Seidel by the National City representative just over a month prior. However, attached to the Proof of Claim was an accounting indicating that the principal balance was $56,425.12 and accrued interest was $513.69, manifesting a total debt amount of $56,938.81.

Prior to the creditors' meeting, Ms. Seidel had concerns regarding her case and wished to speak with Mr. Warren. Ms. Seidel was deterred, however, from scheduling such a meeting to

---

[3]According to the letter, the amount required to pay the loan in full was $56,712.19, which included an additional recording fee of $32.00.

voice her concerns because the Basic Bankruptcy Flat Fee Agreement indicated that Mr. Warren charged a fee of $60 for such a meeting. This charge was reinforced to Ms. Seidel by Mr. Warren's staff.[4] Recognizing her frugal personal budget, Ms. Seidel decided to forgo meeting with Mr. Warren. An opportunity to raise these concerns with Mr. Warren did present itself immediately after Ms. Seidel's meeting with creditors. Upon revealing her concerns, Mr. Warren assured Ms. Seidel that everything regarding her case was "fine", and that she had nothing to worry about. Mr. Warren then informed her that if she wanted further explanation regarding her case she should call his office and make an appointment.

On September 24, 2009, shortly after the meeting of creditors, the Chapter 13 Trustee filed an Objection to Confirmation of Ms. Seidel's Plan. One of the bases for the Objection was that Ms. Seidel's Chapter 13 Plan improperly provided for Huntington National Bank's ("Huntington") second mortgage to be treated as unsecured and for Huntington to be paid as a general unsecured creditor.[5] Because National City's Proof of Claim indicated an outstanding balance of just $56,425, and Ms. Seidel's residence had been appraised at a value of $56,500, there appeared to be equity in Ms. Seidel's residence to secure Huntington's mortgage and therefore, § 1322 of the Bankruptcy Code mandated treatment of Huntington's claim as fully secured. Thus, the Trustee objected, the Plan was not confirmable due to the improper treatment

---

[4] According to Mr. Warren, a fee is only charged for a meeting that occurs post confirmation of a client's plan. During the hearing, Mr. Warren disputed that his staff told Ms. Seidel that such meetings cost $60 because his staff knew what is a chargeable meeting and what is not. That may be the case; however, Ms. Seidel's testimony was convincing that the staff failed to make that distinction to her.

[5] Section 506 of the Bankruptcy Code allows a secured creditor's claim to be treated as unsecured for any amount that is greater than the value of the collateral. This is limited by § 1322, which generally prohibits such treatment of home mortgages in Chapter 13 cases. Notwithstanding § 1322, if the amount of a senior lienholder's claim exceeds the value of the property, then a junior lienholder's claim may be treated as unsecured even though it is coupled with a lien on the debtor's residence because there will be no equity to secure the junior lienholder's claim. *Nobelman v. American Savings Bank*, 508 U.S. 324, 113 S. Ct. 2106, 124 L. Ed. 2d 228 (1993); *Lane v. Western Interstate Bancorp, (In re Lane)*, 280 F. 3d 663 (6th Cir. 2002).

of Huntington and its second mortgage. It was apparent to the Court throughout the Show Cause hearing (and the history of this case), that Ms. Seidel is a meticulous person, pays close attention to her affairs, is clearly attentive to and invested in her case, and strives to understand the legal aspects of her case as well as how the factual underpinnings of her situation relate to those legal issues. Thus it is no surprise that upon receiving the Trustee's objection, Ms. Seidel tried to contact Mr. Warren's office for explication. After numerous unanswered phone calls, Ms. Seidel drove to Mr. Warren's office where she met with Mr. Warren's office manager, Mishawn Ecbaugh. Ms. Ecbaugh explained to Ms. Seidel that objections to confirmation were a typical occurrence early in the bankruptcy process and that Ms. Seidel should not anguish over it. After this assurance that everything was going fine, Ms. Seidel left with an understanding that Mr. Warren was taking care of her concerns.

Sometime before October 5, 2009, but subsequent to meeting with Ms. Ecbaugh, Ms. Seidel received a notice rescheduling her confirmation hearing from its original date of October 8, 2009 to November 5, 2009. This notice engendered the previously quelled concern within Ms. Seidel about her bankruptcy, and caused her to call Mr. Warren's office once again. Ms. Seidel succeeded in scheduling an appointment to meet with Leann Potts, another of Mr. Warren's paralegals. During the appointment with Ms. Potts on October 5, 2009, Ms. Seidel voiced her concerns regarding the objection to confirmation once again. Ms. Potts informed Ms. Seidel of the amount of National City's Proof of Claim, which, as previously noted, was ostensibly lower than the amount Ms. Seidel was quoted by National City representative a few months prior. Ms. Potts explained to Ms. Seidel that because of this lower amount, Ms. Seidel could not treat Huntington's second mortgage as unsecured. Ms. Potts further explained that Ms. Seidel's only remedy to this situation would be to deliberately default on her payments to the

Chapter 13 Trustee, causing a dismissal of her case. Once her case was dismissed, Ms. Potts explained, she could file for bankruptcy again, and at that time Ms. Seidel's outstanding balance on National City's mortgage would be undoubtedly greater than the appraisal of Ms. Seidel's residence, as a consequence of the missed payments. Ms. Seidel found the proposed remedy to be disconcerting, and indicated to Ms. Potts she could not comprehend filing for bankruptcy a second time and would be unwilling to deliberately default on her payments to the Trustee. Ms. Seidel then asked Ms. Potts if she could call National City from Mr. Warren's office for the purpose of verifying the amount she was given previously. Ms. Potts declined. During this exchange, Mr. Warren happened to walk by, at which time Ms. Seidel beseeched Mr. Warren to "fight" for her against, what she believed to be an incorrect Proof of Claim filed by National City. Mr. Warren responded by telling Ms. Seidel that she should not have "given him the wrong numbers" and that there was nothing he could do at that point in time. Mr. Warren exclaimed that he was powerless to make any attempt to change the amount set forth in the Proof of Claim. Mr. Warren reiterated Ms. Potts' proposed remedy to default on her payments, and upon the inevitable dismissal of her case, to file for bankruptcy again. He also explained that, in such event, he would not refund any of the fee she had been charged for the current case and he would charge another fee of $3000 for the subsequent bankruptcy case. Unwilling to pursue such a course of action, Ms. Seidel departed.

After her departure, Ms. Seidel contacted National City and requested they fax the document containing the "payoff" amount of her first mortgage to Mr. Warren's office.[6] Subsequently, Ms. Seidel tried, unavailingly, to contact Mr. Warren's office in order to verify

---

[6]This documentation was a duplicate of the letter that Ms. Seidel previously forwarded to Mr. Warren's office.

the requested document had been faxed to Mr. Warren's office and to discuss the issue regarding National City's Proof of Claim. Being unable to obtain answers regarding her routine questions, Ms. Seidel sent a letter to the Court.[7] The contents of the letter shed light on her experience to that point in time. After the letter was sent, Mr. Warren's office contacted Ms. Seidel to request a meeting with Mr. Warren.[8] The meeting took place on October 20, 2009, and accompanying Ms. Seidel at the meeting was her acquaintance Mr. Burton. At an emotional conference, Mr. Warren revealed his agitation regarding Ms. Seidel's correspondence with the Court. He forbid Ms. Seidel from contacting the Court and stated that he would terminate their attorney-client relationship if she did so again. Mr. Warren then lectured Ms. Seidel that National City's Proof of Claim amount would "crater" their plans to treat Huntington's second mortgage as unsecured, but, Mr. Warren went on, this was not his fault because she had given him "the wrong numbers."

Immediately following this meeting, Ms. Seidel sent a second letter to the Court. The contents of the letter illustrated the events of the October 20th meeting, and objected to National City's Proof of Claim. The letter set forth a concise statement of the grounds upon which Ms. Seidel was objecting, the Claim being lower than the true debt amount; and stated a specific request for treatment of National City's Proof of Claim, that being to increase the claim amount to $56,938.81. This prompted the Court to docket and treat the letter as an objection to National City's Proof of Claim. There being no objection and the documentation attached to the Proof of Claim verifying the correct amount, the Objection was sustained by the Court on January 13, 2010. Prior to the Court's Order, however, Mr. Warren sent a memo to Ms. Seidel dated

---

[7]Upon receipt of Ms. Seidel's letter, the Court promptly docketed it as "Notice filed by Linda I. Seidel" (Doc. #29).

[8]Mr. Warren did not charge Ms. Seidel a $60 fee for this meeting, since Mr. Warren personally requested it.

November 4, 2009, asking her to schedule an appointment with Ms. Potts to discuss how Ms. Seidel would like to proceed, and informing Ms. Seidel that her next hearing date was December 3, 2009. Ms. Seidel attempted to comply with the memo, but Ms. Potts was ignorant as to the reason for the proposed meeting and informed Ms. Seidel that she would follow up with Ms. Seidel within the next week. After waiting over a week without receiving a call, on November 16, 2009 Ms. Seidel sent an email to Ms. Potts, complaining of mounting frustration toward Mr. Warren's office and its apathetic responses to her inquiries. This email also informed Mr. Warren's office of Ms. Seidel's letter to the Court, sent October 20, 2009. The letter, being in direct contradiction to Mr. Warren's admonishment, prompted Mr. Warren to file a motion to withdraw as counsel on November 18, 2009.

On December 1, 2009, Ms. Seidel received another memo from Mr. Warren titled "Attend all Hearings." Although he had not yet been permitted by the Court to withdraw as her counsel, the memo informed Ms. Seidel that due to Mr. Warren's withdrawal, she must attend all future hearings, that her next hearing was scheduled for December 3, 2009, that Mr. Warren would not be attending, and that if Ms. Seidel was not in attendance her case could be dismissed. As instructed, Ms. Seidel dutifully attended her confirmation hearing on December 3rd. Also, true to his statement, Mr. Warren was not in attendance. Mr. Warren asserts that he retained Mr. Tad Semons, Esq. to represent Ms. Seidel at the confirmation hearing, although he did not advise Ms. Seidel that he was doing so; that Mr. Semons attended the Trustee's pre-confirmation conference; and that Mr. Semons departed subsequent to the Trustee's pre-confirmation conference, because, in accordance with local practice, the hearing was to be continued as the case was not in a posture for confirmation. However, Ms. Seidel attended the Trustee's pre-confirmation conference and did not encounter Mr. Semons, nor was she ever approached by Mr.

Semons throughout the day of her confirmation hearing. In due course, Ms. Seidel's case was called and Ms. Seidel appeared on her own behalf. The confirmation hearing record reveals that Mr. Semons represented a debtor on behalf of Mr. Warren in the hearing immediately prior to Ms. Seidel's hearing, yet failed to put in an appearance on Ms. Seidel's behalf. The previous matter was concluded at 4:19:17 pm; Ms. Seidel's case was called exactly 6 seconds later. The Court finds it virtually impossible for Mr. Semons to have exited the courtroom prior to the Court calling Ms. Seidel's case. It is incredulous that if Mr. Warren adequately prepared or retained Mr. Semons to represent Ms. Seidel, that Mr. Semons would not have attempted to identify Ms. Seidel at the pre-confirmation conference, or would not to have stopped and put in an appearance on behalf of Ms. Seidel once he became aware of her confirmation hearing being called by the Court.

Subsequent to the confirmation hearing, communication between Ms. Seidel and Mr. Warren was seemingly obsolete. Nonetheless, Mr. Warren wrote Ms. Seidel on January 7, 2010 explaining that he still represented her and would continue to do so until the Court granted his motion to withdraw. The letter also extended an open invitation to Ms. Seidel to schedule a meeting with Mr. Warren in order to discuss how they were to proceed in her case. Shortly after this letter, based on Ms. Seidel's letters to the Court and her statements at the confirmation hearing, the Court entered the Show Cause Order, which gave rise to this matter.

## II. CONCLUSIONS OF LAW

### A. *RESTRICTIONS ON DEBT RELIEF AGENCIES*

The Court's Show Cause Order indicated its purpose was to determine whether Mr. Warren, inter alia, violated 11 U.S.C. § 526(a)(1), (3), and (4). Section 526 of the Bankruptcy Code was enacted by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005

("BAPCPA"), and "establishes several rules of professional conduct for persons qualifying as debt relief agencies." *Milavetz, Gallop & Milavetz, P.A. v. United States,* 559 U.S. ___, 130 S. Ct. 1324, 1330, 176 L. Ed. 2d 79, 85 (2010). Section 101(12A) of the Bankruptcy Code defines the term "debt relief agency" as "any person who provides any bankruptcy assistance to an assisted person in return for the payment of money or other valuable consideration, or who is a bankruptcy petition preparer under section 110 ...." The term "bankruptcy assistance" is further defined by § 101(4A) of the Bankruptcy Code as "any goods or services sold or otherwise provided to an assisted person with the express or implied purpose of providing ... legal representation with respect to a case or proceeding under this title." The Bankruptcy Code defines "assisted person" in § 101(3), as "any person whose debts consist primarily of consumer debts and the value of whose nonexempt property is less than $164,250." After reviewing the plain language of these Bankruptcy Code sections, the United States Supreme Court recently held that attorneys fall within the meaning of "debt relief agencies." *Milavetz,* 130 S. Ct. at 1333. As such, attorneys, including Mr. Warren, are held to the professional standards and restrictions set forth in § 526.

In the present case, Ms. Seidel's schedules indicate that her debts consist primarily of consumer debts and the value of her nonexempt property is less than $164,250. Thus, Ms. Seidel qualifies as an "assisted person" pursuant to the definition provided in § 101(3). Accordingly, § 526(a) is applicable to the instant case.

### 1.    *Advising Debtor to Incur Debt to Pay an Attorney*

Section 526(a)(4) specifically prohibits a debt relief agency from advising "an assisted person or prospective assisted person to incur more debt ... to pay an attorney ... or charge for services performed as part of preparing for or representing a debtor in a case under this title." In

other words, § 526(a)(4) prohibits bankruptcy practitioners from advising their clients to incur more debt to pay for legal services related to an imminent bankruptcy proceeding. The purpose of this prohibition is to avert the substantial risk that such a practice poses to both debtor and creditor. As to the debtor, if the creditor discovers the timing and reason for such a charge it will have a strong basis pursuant to § 523(a)(2)(A) to challenge the dischargeability of the debt incurred thereby.[9] Thus, a debtor is injured in that he or she forgoes the "fresh start" promised by bankruptcy, and remains shackled by debt incurred prior to the bankruptcy case. On the other hand, if the creditor fails to bring such a nondischargeability claim, then such a debt ordinarily will be discharged. Therefore, the creditor is injured in that it has been denied payment of a loan incurred through false pretenses, false representation or actual fraud. Ostensibly, § 526(a)(4) is drafted for the purpose of protecting both debtors and creditors from the significant risk of injury posed by the debtor incurring additional debt immediately prior to filing bankruptcy. *See Milavetz,* 130 S. Ct. at 1334, 1446.

Mr. Warren's conduct in the instant case is precisely the conduct that § 526(a)(4) was designed to prohibit. Upon indicating to Mr. Warren her inclination to seek bankruptcy relief during their first consultation, Mr. Warren immediately stated that he would charge her credit card to pay his fee and the court costs. Understanding the general concepts of bankruptcy, Ms. Seidel was concerned about this means of payment and asked Mr. Warren if the credit card company, Discover, would pursue remedies against her. Mr. Warren appeased Ms. Seidel's fears by making the statement "people do this all the time, it's no big deal." According to Ms. Seidel,

---

[9]As discussed more fully later, inasmuch as the debt would be incurred in contemplation of bankruptcy, the debtor would be hard pressed to deny that the debt was incurred under false representations.

Mr. Warren issued her the document titled Be Careful How You Use Credit Cards, only after processing the charge to her credit card account.

Mr. Warren's testimony contradicts Ms. Seidel's testimony in part. Mr. Warren exclaimed at the hearing that he does not solicit clients, including Ms. Seidel, to pay his fees with a credit card. However, he freely admitted that he does in fact accept credit cards if a client broaches the idea of paying with one. Mr. Warren adamantly refuted that he issued Ms. Seidel the cautionary document titled Be Careful How You Use Credit Cards after he charged her credit card. Rather, he insisted the document was tendered to Ms. Seidel prior to processing the charge to her credit card. He explained that when any prospective client introduces the idea of paying for his services with a credit card, his practice invariably is to provide the warning document before he charges the client's credit card, and according to Mr. Warren, Ms. Seidel's case was no exception to this practice.

The Court finds the inconsistency between Ms. Seidel's and Mr. Warren's testimonies irrelevant. Section 526(a)(4) explicitly prohibits an attorney from advising a debtor to incur more debt for the purpose of obtaining bankruptcy related legal services. Section 526(a)(4) does not provide that this prohibition may be waived if a client is advised of the consequences of charging a credit card immediately prior to pursuing bankruptcy relief. The congruous testimony of both parties evinces the fact that Mr. Warren advised Ms. Seidel that she could charge her credit card, incurring more debt, in order to pay his fee for representing Ms. Seidel in her bankruptcy case. Furthermore, by charging Ms. Seidel's credit card to pay his fee, Mr. Warren tacitly advised Ms. Seidel to incur more debt for the purpose of obtaining his representation in the impending bankruptcy. As explained above, the incurrence of said debt

posed a substantial risk of harm to both Ms. Seidel[10] and the credit card company. Thus, Mr. Warren's insidious conduct is precisely the conduct expressly prohibited by § 526(a)(4). Consequently, by facilitating and partaking in such conduct, the Court is compelled to find Mr. Warren in violation of § 526(a)(4).

## 2. *Failure to Perform Services*

Mr. Warren's conduct, is also in clear violation of § 526(a)(1). Specifically, § 526(a)(1), prohibits a debt relief agency from "fail[ing] to perform any service that such agency informed an assisted person or prospective assisted person it would provide in connection with a case or proceeding under this title." In the present case, Mr. Warren informed Ms. Seidel by means of his Bankruptcy Flat Fee Agreement (the "Fee Agreement") that he would provide her a variety of services in connection with her Chapter 13 case. These services included a covenant to "[d]iscuss with [Ms. Seidel] any issues that arise during the case," to "[c]ounsel [her] about filing either a Chapter 7 or Chapter 13 case ..." and "[e]xplain the bankruptcy process and how the case will proceed." From the evidence adduced at the hearing, it is clear that Mr. Warren failed to adequately perform these services. Ms. Seidel's testimony revealed her, at times, futile efforts to contact Mr. Warren's office to discuss her concerns and issues regarding her bankruptcy case. For instance, upon receipt of the objection to confirmation shortly after the meeting of creditors, Ms. Seidel was unable to successfully contact Mr. Warren to discuss the Chapter 13 Trustee's objections to confirmation of her plan. By failing to discuss the objection with Ms. Seidel, Mr. Warren failed to provide a service that he had committed to provide,

---

[10]Upon inquiry from the Court, Mr. Warren testified that he understood that such a debt could be found nondischargeable pursuant to § 523(a)(2)(A). Mr. Warren went on, however, to justify his actions by stating that if he did not accept payment by such means, some of his clients would be subject to garnishment and foreclosure. The Court does not find this justification to either mitigate or to absolve Mr. Warren from his violation of § 526(a)(4).

through the Fee Agreement. This failure is a clear violation of § 526(a)(1), in that Mr. Warren failed to provide a service that he had informed an assisted person he would in fact provide.

Moreover, the Fee Agreement also informed Ms. Seidel that Mr. Warren's office would counsel her regarding the filing of either a Chapter 7 or Chapter 13 case, and "explain the bankruptcy process and how the case will proceed." Ms. Seidel's testimony indicated that after the initial consultation, she believed she was proceeding under Chapter 7 rather than Chapter 13, a process that would endure approximately four months and result in her paying a mere $900 for the benefit of her creditors. However, Ms. Seidel was surprised to discover upon her second meeting with Mr. Warren's office that she was in fact proceeding under Chapter 13, which required her to endure a five year bankruptcy process and pay approximately $6,000 for the benefit of her creditors. This testimony intimates that Mr. Warren did not adequately explain to Ms. Seidel how her case would proceed. The Court recognizes that clients can often misunderstand counsel's advice, instructions, and information, especially given the stressful situation present when they are compelled to seek advice regarding bankruptcy options. However, Ms. Seidel is clearly an intelligent person who gives serious and due thought and consideration to her personal and financial affairs. If Mr. Warren had provided sufficient information, Ms. Seidel would not have been confounded during her second meeting with Mr. Warren's office when discussing the amount she would be required to remit to her creditors through Chapter 13. Moreover, if Mr. Warren had advised Ms. Seidel of even the standard Chapter 13 process, Ms. Seidel would have undoubtedly understood her bankruptcy to endure for a period of at least 36 months and possibly up to 60 months, rather than her misconception of the significantly shorter time period of three to four months. Thus, it is evident that Mr. Warren

did not sufficiently counsel Ms. Seidel regarding her Chapter 13 case, which was a service he had committed to provide. This failure renders him in further violation of § 526(a)(1).

In addition to the above representations of services to be performed, Mr. Warren also constructively informed Ms. Seidel of various other services he would provide in connection with her case. Mr. Warren and Ms. Seidel entered into a Fee Agreement, which is permitted under Rule 2016-1(b)(2)(A) of the Local Bankruptcy Rules ("L.B.R.") of the Southern District of Ohio. L.B.R. 2016-1(b)(2)(A) in effect at the time authorized an attorney's fee of $3000 in Chapter 13 cases, without a hearing or specific itemization. In local jargon, this is called the "no look fee." But the Rule also mandated that, in exchange for the "no look fee" of $3000, the debtor's attorney provide the debtor with specific services during the Chapter 13 case. L.B.R. 2016-1(b)(2)(A) (January 1, 2006)[11] specifically provided that

> [a]pplications or disclosures which do not exceed an amount considered reasonable for an average case from initial interview through confirmation of the plan, and continuing with a review of the filed claims and the filing of objections to non real estate and mortgage claims or as further provided in an Order Allowing Fees, may be allowed up to $3,000 without actual hearing or specific itemization.[12]

Therefore, by entering into the Fee Agreement, Mr. Warren was required to provide the services that would be rendered in an average case from the initial interview through confirmation of the plan. Although not specifically mentioned in the Rule, certainly representation at the

---

[11] The Local Bankruptcy Rules were amended effective December 1, 2009.

[12] It should be noted that Mr. Warren's Post-hearing Brief was remiss in its reliance upon the amendments made to the L.B.R. 2016-1(b)(2)(A) after the instant case arose. However, the Court finds amendments to said Rule to be helpful for clarification purposes as to what services are to be provided in a "average case from initial interview through confirmation of the plan."

confirmation hearing(s) would be considered routine services to be provided.[13]   There is no dispute that Mr. Warren was absent from the confirmation hearing, although he had not yet been allowed to withdraw as counsel, nor did he provide any effective counsel for her.   Inherent in the requirement that debtor's attorney represent the client at the confirmation hearing is that the attorney must represent the client's interest, advise the client as to how the case is proceeding and will proceed, and give guidance to the client as to their options during the case.   Merely placing a warm body next to the debtor at the confirmation hearing is a far cry from meeting this requirement, let alone the failure to place any body next to Debtor.   Therefore, in light of the above facts and expectations of debtor's counsel, the Court is not satisfied that Mr. Warren represented Ms. Seidel at the confirmation hearing, which is a service he informed Ms. Seidel he would provide.

Perhaps more importantly, Mr. Warren failed to pursue avoidance of Huntington's second mortgage on Ms. Seidel's residence.   From the facts previously discussed, it is clear that Mr. Warren committed to effect stripping off this second mortgage.[14]   This is evident not only from the Chapter 13 Plan, which proposed to strip off the mortgage, but it is also evident from the actions of Ms. Seidel.   To strip off Huntington's mortgage, Mr. Warren properly requested Ms. Seidel to obtain an appraisal of her residence, and to determine the outstanding balance on

---

[13] Shortly after Mr. Warren and Ms. Seidel entered into the Fee Agreement, L.B.R. 2016-1(b)(2)(A) was amended. Although those amendments are not applicable to the instant case, the amendments are illustrative of the particular services counsel is expected to render to or for a debtor from the initial interview through an average case. As amended, L.B.R. 2016-1(b)(2)(A)(v) requires the debtor's to, among other services, prepare amendments, respond to routine phone calls and questions, review claims, file objections to claims, and represent the debtor at the confirmation hearing.

[14] "Stripping off" a mortgage is bankruptcy colloquialism for avoiding a mortgage for which there is insufficient equity in the collateral to secure.

her first mortgage held by National City Bank.[15]  Ms. Seidel diligently acquired the requested information.  When National City filed a faulty Proof of Claim, he abandoned the notion, rather than examining relevant documents (the letter and the attachments to the Claim) to determine the appropriate course of action.  As discussed in more detail in section B.3. below, it is evident that Mr. Warren failed to pursue Ms. Seidel's rights in the Chapter 13 case, without just cause.

In summation, Mr. Warren informed Ms. Seidel, by means of the Fee Agreement, that he would, inter alia, counsel her as to filing her Chapter 13 case, explain the bankruptcy process and how the case would proceed, and discuss with her any issues that arise during the case. Furthermore, by taking on the employment, Mr. Warren was further obligated to perform all services described in L.B.R. 2016-1(b)(2)(A).  Finally, he committed to address Huntington's second mortgage during the course of the bankruptcy case.  The evidence and testimony adduced at the hearing demonstrates that Mr. Warren failed to perform these services.  As a result, the Court is compelled to find Mr. Warren's conduct to be in violation of § 526(a)(1).

### 3.    *Misrepresentation of Services*

In addition to § 526(a)(1), § 526(a)(3) also sets forth a standard of professional conduct. In particular, § 526(a)(3) provides that a debt relief agency shall not "misrepresent to any assisted person or prospective assisted person, directly or indirectly, affirmatively or by material omission, with respect to - (A) the services that such agency will provide to such person ...." Thus, Mr. Warren will be in violation of  §526(a)(3) if he misrepresented to Ms. Seidel the services to be provided to her during her bankruptcy case.

---

[15]  For purposes of lien stripping pursuant to § 506 of the Bankruptcy Code, the court properly considers the entire amount due the secured creditor as of the date of the Petition for Relief, not merely the outstanding principal balance.

As discussed above, when Mr. Warren entered into the Fee Agreement with Ms. Seidel, he became obliged to provide the services encompassed by L.B.R. 2016-1(b)(2)(A). Certainly, responding to phone calls and answering routine questions about the bankruptcy process would be normal, routine services that counsel should provide.[16]  As discussed above, whether he intended to do so or not, Mr. Warren's office effectively squelched Ms. Seidel's efforts to garner information and gain knowledge about her case and its issues, by telling her there would be a fee for any office visits or consultations.  In fact, Mr. Warren openly conceded that he refuses to talk to his clients over the phone.   Moreover, despite this duty, the Fee Agreement states that the client must "[m]ake appointments for office visits ... [and that] ... Warren Law Firm cannot discuss Client's case by telephone or email."   Contained upon the same page of the Fee Agreement is a further statement which informs the client that "[o]nly general questions will be answered by telephone or email.   If [the client has] specific questions about [the] case, [the Client] must make an appointment to visit Mr. Warren. [The Client] *must* pay a $60.00 office visit fee for these extra visits." (Emphasis added.)   When read together, these provisions represent to a client, as they did to Ms. Seidel, that questions regarding their case will not be answered unless a fee of $60 is first remitted to Mr. Warren.  This condition was reinforced to Ms. Seidel by Mr. Warren's office staff.  Thus, the provisions indicate to the client that their flat fee does not include the service of answering their questions.  However, L.B.R. 2016-1(b)(2)(A) requires Mr. Warren, to provide that specific service.  Consequently, the Fee Agreement and Mr. Warren's staff misrepresented the services his office would provide.  This misrepresentation of

---

[16] The amended Rule specifies that an attorney must respond to "routine phone calls and questions."  L.B.R. 2016-1(b)(2)(A)(vii).

services to be provided is a clear violation of § 526(a)(3) as set forth above and mandates this Court to find accordingly.

**B.** ***L.B.R. 2090-2***(A) *AND THE* **OHIO RULES OF PROFESSIONAL CONDUCT**

Local Bankruptcy Rule 2090-2(a)[17] makes the Ohio Rules of Professional Conduct applicable to bankruptcy proceedings. L.B.R. 2090-2(b) permits this Court, "through its inherent powers, [to] discipline attorneys who practice before it ...." Thus, pursuant to the Local Bankruptcy Rules cited above, the Court may impose sanctions if it finds Mr. Warren to have violated the Ohio Rules of Professional Conduct.

**1.** ***Competence***

Ohio Rule of Professional Conduct 1.1 mandates a lawyer to "provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation *reasonably* necessary for the representation." Comment 5 of Rule 1.1 states that "[c]ompetent handling of a particular matter includes . . . adequate preparation." Comment 5 goes on to explain that "[t]he required attention and preparation are determined in part by what is at stake ...."

In the instant case, Mr. Warren testified that he retained Mr. Semons to represent Ms. Seidel at her confirmation hearing on December 3, 2009. However, Mr. Semons did not in fact attend Ms. Seidel's confirmation hearing. Moreover, the evidence suggests that Mr. Semons more than likely did not attend Ms. Seidel's preconfirmation conference with the Trustee either. The evidence reflects that Mr. Warren either did not adequately prepare Mr. Semons to represent

---

[17]Mr. Warren's Post-hearing Brief suggested that the proceedings before this Court implicated only L.B.R. 2016-1 and not L.B.R. 2090-2. Contrary to the assertions of Mr. Warren's Post-hearing Brief, this Court, in response to Mr. Warren's counsel's less than articulate or clear citation of the pertinent Local Bankruptcy Rule, explicitly stated that the proceeding was not one of suspension or disbarment. However, the Court never stated that it was not proceeding with sanctions pursuant to L.B.R. 2090-2(b).

Ms. Seidel that day, or Mr. Warren simply did not retain Mr. Semons for the purposes of representing Ms. Seidel. In light of what was at stake for Ms. Seidel at her confirmation hearing, the Court finds either circumstance to be in violation of Ohio Rule of Professional Conduct 1.1. The Trustee's Objection to Confirmation (Doc. #20) indicated numerous concerns regarding Ms. Seidel's proposed Plan. Furthermore, there is always a possibility that a debtor's case may be dismissed at a confirmation hearing, especially if there is no appearance by or on behalf of the debtor and no explanation for the failure to appear. Thus, Mr. Warren should have exercised a diligent standard of attention and preparation towards Ms. Seidel's case that day. By failing to attend this hearing, the requisite attention and preparation were clearly absent. Therefore, Mr. Warren's conduct regarding Ms. Seidel's confirmation hearing is in violation of Ohio Rule of Professional Conduct 1.1.

### 2.  *Counseling Client in Fraudulent or Illegal Conduct*

Similar to the above discussion on § 526(a)(4) of the Bankruptcy Code, Ohio Rule of Professional Conduct 1.2(d) prohibits attorney's from engaging in certain conduct. Specifically, Ohio Rule of Professional Conduct 1.2(d) prohibits an attorney from "counsel[ing] a client to engage, or assist[ing] a client, in conduct that the lawyer *knows* is *illegal* or *fraudulent*." Ohio Rule of Professional Conduct 1.0(d) defines the term "fraudulent" as "conduct that has an intent to deceive and is . . . an actual or implied misrepresentation of a material fact that is made . . . with knowledge of its falsity or with such utter disregard and recklessness about its falsity that knowledge may be inferred." Ohio Rule of Professional Conduct 1.0(e) goes further to define the term "illegal" as denoting "criminal conduct or a violation of an applicable statute or administrative regulation." Therefore, Mr. Warren will be in violation of Ohio Rule of Professional Conduct 1.2(d) if he counseled or assisted Ms. Seidel in violating any section of the

Bankruptcy Code, and/or counseled or assisted Ms. Seidel in making a misrepresentation of material fact.

Section 523(a)(2)(A) of the Bankruptcy Code excepts from a debtors discharge "any debt for money, ... services or an extension, renewal, or refinancing of credit, to the extent obtained by ... false pretenses, a false representation, or actual fraud ...." In determining false representation encompassed by § 523(a)(2)(A) and the use of credit cards, courts look to the subjective intent of the debtor at the time of the credit card use. *See In re Manning,* 280 B.R. 171, 185 (Bankr. S. D. Ohio 2002)(citing *Rembert v. AT&T Universal Card Servs., Inc., (In re Rembert),* 141 F.3d 277, 281 (6th Cir. 1998)). The use of a credit card in and of itself is deemed an actual or implied representation to the credit card issuer of an intent to repay the debt incurred. *Chevy Chase Bank FSB v. Kukuk (In re Kukuk),* 225 B.R. 778, 785 (B.A.P. 10th Cir. 1998). "[A]n implied representation of intent to repay will be fraudulent if . . . at the time the debtor used a credit card he or she had no intent to repay the debt incurred." *Kukuk,* 225 B.R. at 786. In the present case, Ms. Seidel did not intend to pay the debt incurred (i.e., the charge on the credit card) for Mr. Warren's fee; rather she intended to seek bankruptcy protection and to pay only a yet to be determined percentage of the debt through her bankruptcy. This was conclusively established by Ms. Seidel's testimony. Thus, use of her credit card to pay Mr. Warren's fee is a false representation within the meaning of § 523(a)(2)(A) of the Bankruptcy Code. Moreover, Mr. Warren has been a bankruptcy practitioner for approximately eighteen years, and therefore knew that Ms. Seidel, who was preparing to file bankruptcy, had no intention of repaying the credit card debt incurred to pay his fee. By accepting payment by means of Ms. Seidel's credit card, Mr. Warren assisted Ms. Seidel, his client, in conduct that he

knew to be fraudulent. As such, Mr. Warren clearly violated Ohio Rule of Professional Conduct 1.2(d) by "assist[ing] a client . . . in conduct that [he] *knows* is . . . *fraudulent*."[18]

### 3. *Diligence and Promptness in Representing a Client*

Ohio Rule of Professional Conduct 1.3 mandates attorneys to "act with *reasonable* diligence and promptness in representing a client." Comment 1 to said Rule gives interpretive guidance: "A lawyer should pursue a matter on behalf of a client despite opposition, obstruction, or personal inconvenience to the lawyer. A lawyer also must act with commitment and dedication to the interest of the client." Comment 4 to the same Rule further points out that "[a] lawyer should carry through to conclusion all matters undertaken for a client, unless the client-lawyer relationship is terminated as provided in Rule 1.16." After consideration of these comments, the Court finds Mr. Warren's conduct violative of Ohio Rule of Professional Conduct 1.3.

From the facts previously discussed, the Court may surmise that a primary impetus of Ms. Seidel's bankruptcy was Huntington's second mortgage on her residence. The testimony further revealed that bankruptcy relief was appealing to Ms. Seidel because she would have the possibility of stripping off this second mortgage. To strip off Huntington's mortgage, Mr. Warren properly requested Ms. Seidel to obtain an appraisal of her residence, and to determine the outstanding balance on her first mortgage held by National City Bank. Ms. Seidel diligently acquired the requested information. She obtained an appraisal of her residence, which determined that the value of her residence was $56,500. Ms. Seidel then obtained a letter from

---

[18] Other courts have found similar conduct to be in violation of Professional Rule of Conduct 1.2(d). In *Attorney Grievance Commission of Maryland v. Culver*, 849 A.2d 423, 381 Md. 241 (Md. 2004), the court held an attorney in violation of Professional Rule of Conduct 1.2(d) when he advised his client to obtain new credit cards and to take cash advances on those accounts in order to pay his attorney's fees and then advised the client that she would not have to repay those funds because he would represent her in bankruptcy and have the debts discharged.

National City, which stated that the mortgage balance was approximately $56,680, as of the date of the letter. It is clear that there was no equity in the residence to secure Huntington's mortgage. This should have allowed her to pursue stripping off Huntington's mortgage, and treating the debt due Huntington as unsecured in her Chapter 13 Plan.

Subsequent to the filing of her petition and schedules, National City filed a Proof of Claim, which stated on the face of the Claim that the mortgage amount was $56,425.12. However, the attachment to National City's Proof of Claim reflected that the entire outstanding balance of $56,938.81. This lower amount set forth on the face of the Claim seemingly evinced equity in Ms. Seidel's residence, which required Huntington's second mortgage to be treated as fully secured. Realizing the consequences of this, Ms. Seidel contacted Mr. Warren and requested he make an effort on her behalf to correct or object to National City's Proof of Claim. This request, however, fell on deaf ears. Mr. Warren exclaimed to her that he could do nothing about National City's Claim. At the hearing on the Show Cause Order, Mr. Warren and his counsel emphatically asserted that Mr. Warren could not have ethically objected to National City's Proof of Claim based solely on Ms. Seidel's hearsay information regarding the National City debt.

The Court finds Mr. Warren's reasoning for failure to file an objection to National City's Proof of Claim to be woefully amiss. First, Mr. Warren's declaration that a debtor is saddled with the figures submitted on a creditor's proof of claim, and that debtor's attorney can do nothing about it, is utterly incorrect. The Bankruptcy Code allows a debtor to object to a creditor's proof of claim, and in fact Ms. Seidel, in her pro se capacity, successfully did so when Mr. Warren refused to.

Moreover, despite the assertions made by Mr. Warren and his counsel, Mr. Warren had more evidence than simply Ms. Seidel's hearsay regarding National City's debt. Not only did Ms. Seidel provide to Mr. Warren the letter from National City, which clearly stated that the "Total Amount to Pay Loan in Full" was $56,732.19 (that being $56,680.19 plus recording and service fees), but the attachment to the Proof of Claim stated that "Total Debt" was $56,938.81. Mr. Warren's testimony exclaiming he could not ethically pursue an objection to the Claim because he did not know precisely what National City's documents meant is simply disingenuous. It is plainly evident that he simply did not undertake an examination of the letter from National City provided him by Ms. Seidel multiple times, or of the Proof of Claim filed by National City. Mr. Warren's failure to address National City Claim constituted a failure to act "with commitment and dedication to the interest of the client." Ohio Prof. Cond. Rule 1.3 cmt. 1. Therefore, this Court finds Mr. Warren's misfeasance violative of Ohio Rule of Professional Conduct 1.3.

Comment 4 to the same Rule illuminates the intent of the Rule, stating that an attorney "should carry through to conclusion all matters under taken for a client, unless the client-lawyer relationship is terminated as provided in Rule 1.16." Ohio Rule of Professional Conduct 1.16(c) provides that "[i]f permission for withdrawal from employment is required by the rules of a *tribunal*, a lawyer shall not withdraw from employment in a proceeding before that tribunal without its permission." Complimenting this Rule is L.B.R. 2091-1(a)(2)(2006), which sets forth the procedure for withdrawal from a client's representation: "[T]he ... withdrawal of a case attorney shall be permitted only upon ... (2) ... written motion for ... withdrawal served upon the client, a showing of good cause and upon such terms as the court shall impose." When read

together, these Rules indicate that an attorney must continue his or her representation of a client until that attorney properly files a motion to withdraw *and* the motion is granted by the Court.

Mr. Warren filed a Motion to Withdraw as Ms. Seidel's attorney on November 17, 2009. The Motion had not been granted by this Court as of December 3, 2009, nor could it be inasmuch as the period had not passed within which a party in interest could object pursuant to L.B.R. 9013-3. However, Mr. Warren failed to represent Ms. Seidel at her confirmation hearing on December 3, 2009. This failure clearly flies in the face of Ohio Rule of Professional Conduct 1.3, as clarified by the corresponding Comment 4, in that Mr. Warren did not "carry through to conclusion all matters undertaken for [the] client." That is, Mr. Warren had not effectively withdrawn as Ms. Seidel's attorney and therefore was mandated to act "with *reasonable* diligence and promptness in representing" Ms. Seidel, which includes "carry[ing] through to conclusion all matters" in her bankruptcy proceeding. By failing to attend Ms. Seidel's confirmation hearing in any fashion, Mr. Warren failed to act with reasonable diligence in representing Ms. Seidel and consequently compels this Court to find him in violation of Ohio Rule of Professional Conduct 1.3.

### 4. *Communication with Client*

Ohio Rule of Professional Conduct 1.4 delineates specific actions an attorney must undertake in regards to their communications with clients. Specifically, Ohio Rule of Professional Conduct 1.4(a)(4) requires an attorney to "comply as soon as practicable with *reasonable* requests for information from the client." Comment 4 pertaining to said rule goes on to explain that Ohio Rule of Professional Conduct 1.4(a)(4) "requires prompt compliance with the request, or if a prompt response is not feasible, that the lawyer, or a member of the lawyer's

staff, acknowledge receipt of the request and advise the client when a response may be expected. Client telephone calls should be promptly returned or acknowledged."

In the instant case, Ms. Seidel's unrefuted testimony evidenced that she called Mr. Warren's office on numerous occasions, and more often than not these phone calls were neglected or ignored. As set forth above, the Ohio Rules of Professional Conduct mandate attorneys to promptly return or acknowledge client telephone calls. Without evidence refuting Ms. Seidel's testimony, this Court finds Ms. Seidel's phone calls to have been unduly neglected and ignored by Mr. Warren and his office. This neglect violates of Ohio Rule of Professional Conduct 1.4(a)(4) as explained by Comment 4, and this Court finds accordingly.

**5.** *Misconduct*

Ohio Rule of Professional Conduct 8.4 outlines specific actions which amount to professional misconduct by a lawyer. Ohio Rule of Professional Conduct 8.4(c) and (d) provide respectively that it is misconduct for a lawyer to "engage in conduct involving dishonesty, *fraud,* deceit, or misrepresentation;" or to "engage in conduct that is prejudicial to the administration of justice[.]" For the reasons explained in detail above, the Court finds that accepting a credit card for payment of a lawyer's bankruptcy fee amounts to fraud. Consequently, by charging Ms. Seidel's credit card to pay his bankruptcy fee and court costs, Mr. Warren engaged in conduct involving fraud and misrepresentation. Therefore, such conduct renders him in violation of Ohio Rule of Professional Conduct 8.4(c).

The Court finds Mr. Warren's acceptance of said credit card payment is also in violation of Ohio Rule of Professional Conduct 8.4(d). Again, as explained above, accepting a credit card payment for fees poses a substantial injury to both debtor and creditor. As to the debtor, if the creditor discovers the timing and reason for such a charge, it will have a strong basis pursuant to

§ 523(a)(2)(A) to challenge the debt as nondischargeable. By the same token, if the creditor fails to bring such a nondischargability action, then such a debt will be discharged upon the conclusion of debtor's bankruptcy case. Consequently, the creditor will be injured in that they have been denied payment of a loan incurred with false representations. Mr. Warren's own testimony acknowledged that he knew such a credit card charge would result in injury to both parties.[19] Therefore, this Court finds Mr. Warren's acceptance of the credit card charge immediately prior to Ms. Seidel's bankruptcy filing to be manipulative of the Bankruptcy Code and as such to be prejudicial to the administration of justice. As a result, Mr. Warren's conduct violates Ohio Rule of Professional Conduct 8.4(d).

### III. CONCLUSION

The evidence and testimony adduced at the hearing illustrated Mr. Warren's numerous violations of § 526 of the Bankruptcy Code. Section 526(c)(5)(A) & (B) allows the Court, upon finding a person in violation of § 526, to "(A) enjoin the violation of such section; or (B) impose an appropriate civil penalty against such person."

Furthermore, the evidence and testimony adduced at the hearing also displayed Mr. Warren's numerous violations of the Ohio Rules of Professional Conduct. Section 329(b) provides that if compensation by a debtor to an attorney "exceeds the reasonable value of any such services, the court may cancel any such agreement, or order the return of any such payment, to the extent excessive ...." 11 U.S.C. § 329(b). Fed. R. Bankr. P. 2017(a) implements § 329(b) by allowing a court, on its own initiative to "determine whether any payment of money ... by the

---

[19]The Court inquired of Mr. Warren if he was aware that pursuant to § 523(a)(2)(A) of the Bankruptcy Code a credit card charge with the knowledge of a pending bankruptcy constitutes false pretenses and may be challenged by a creditor as such. Mr. Warren affirmed he understood that this is a potential result of his acceptance of Ms. Seidel's credit card payment.

debtor, made directly or indirectly and in contemplation of the filing of a petition under the Code ... to an attorney for services rendered to be  rendered is excessive."   Section 329(b)(2) of the Bankruptcy Code, as implemented by Fed. R. Bankr. P. 2017(a), permits this Court to determine Mr. Warren's fee to be excessive and order the return of the excessive fee to "the entity that made such payment."  In making its determination of excessiveness, the Court may and will take into consideration Mr. Warren's violations of the Ohio Rules of Professional Conduct.   *In re Sledge*, 352 B.R. 742, 747-48 (Bankr. E.D.N.C. 2006).  See also *In re Soulisak*, 227 B.R. 77, 82 (Bankr. E.D.Va. 1998).  Furthermore, as indicated at the hearing, the Court is also proceeding under L.B.R. 2090-2(b), which permits the Court "through its inherent powers [to] discipline attorneys who practice before it ...."  Local Bankruptcy Rule 2090-2(a) makes applicable the Ohio Rules of Professional Conduct and thus provides the basis for which this Court determines the following sanctions appropriate.

As sanctions for the violations set forth herein, among other things, the Court will order filing of numerous documents which do not relate to the instant case.  Therefore, the Court has directed the Clerk to open a miscellaneous case, captioned "In re Michael W. Warren, Case No.10-0203" (the "Miscellaneous Case").  Mr. Warren shall file in the Miscellaneous Case the documents indicated in the decretal paragraphs below.   Mr. Warren shall contact the Deputy Clerk in Charge of the Clerk's Office in Columbus, for instruction on the procedure for filing documents in the Miscellaneous Case.

The United States Trustee is vested with the duty to (1) supervise administration of cases commenced under the Bankruptcy Code, (2) monitoring progress of such cases, and (3) monitoring and reviewing compensation sought in such cases by professional persons.  11 U.S.C. §526(a)(3).  Additionally, as a party in interest in all cases, the United States Trustee is

generally vested with the responsibility of assuring compliance with the Bankruptcy Code. Therefore, the Court will direct the United States Trustee for this district to investigate of Mr. Warren's transactions with his clients in all cases filed since the effective date of BAPCPA.

In accordance with the foregoing, it is **ORDERED, ADJUDGED AND DECREED** that:

1.      Mr. Warren is hereby enjoined from violating § 526(a)(4) of the Bankruptcy Code, 11 U.S.C. § 526, and Mr. Warren shall immediately cease and desist from charging any amounts to the credit card accounts of clients who intend to imminently file a bankruptcy case through him as counsel.

2.      Within 7 days of the date of entry of this Order, Mr. Warren shall remit the sum of $3,274 to Ms. Seidel's Discover Credit Card account, and shall file in the instant case proof of same.

3.      Until future order of Court, the "no look fee" authorized pursuant to L.B.R. 2016-1 is suspended for (a) all Chapter 13 bankruptcy cases filed by Mr. Warren assigned to this judge, in which the Court has not yet confirmed a Chapter 13 plan, and (b) all future Chapter 13 bankruptcy cases filed Mr. Warren which are assigned to this judge.  Mr. Warren shall submit a fee application in all such Chapter 13 cases, whether or not a fee was paid prior to commencement of the case.  One year from the date of entry of this Order,  Mr. Warren may move to be relieved of the suspension of the Rule.  Any such motion shall be filed in the Miscellaneous Case.

4.      Within 180 days of the date of entry of this Order, Mr. Warren shall attend six (6) hours of bankruptcy ethics instruction satisfactory to the Court, and shall promptly file proof of such attendance in the Miscellaneous Case.  Within 30 days of the date of entry of this Order,

Mr. Warren shall file in the Miscellaneous Case a list of ethics classes or sessions (described by title, subject matter and sponsor) which he contemplates attending.

5.    Within 30 days of the date of entry of this Order, Mr. Warren shall file in the Miscellaneous Case a list of all bankruptcy clients from whom he procured all or part payment of his bankruptcy attorney's fee or payment of court filing fees by credit card charge, during the period from October 11, 2005 to date.  Such list shall identify the debtors by name and case number, and the amount charged to the clients credit card account.

6.    Upon filing of the documents set forth in paragraph 5, the United States Trustee shall conduct an investigation into the Mr. Warren's transactions with his bankruptcy clients, to determine whether, in the opinion of the United States Trustee, further action should be taken.  The United States Trustee shall file a report in the Miscellaneous Case within 60 days of the filing of the list identified in paragraph 5 above.

**IT IS SO ORDERED**.

COPIES TO:

Default List
Hon. Charles M. Caldwell
Hon. John E. Hoffman, Jr.
Keith Brown, Deputy Clerk In Charge

Via regular mail:

Michael Warren
Warren Law Firm
6 Consumer Center Dr.
Chillicothe, OH 45601

Rick L. Brunner
545 East Town Street
Columbus, Ohio 43215

Kenneth R. Donchatz
KETTLEWELL & DONCHATZ, LLC
545 East Town Street

Columbus, Ohio 43215

Charles J. Kettlewell
KETTLEWELL & DONCHATZ, LLC
545 East Town Street
Columbus, Ohio 43215

Mary Ann Wilsbacher
Assistant United States Trustee
170 N. High St., 2nd Floor
Columbus, OH 43215

###